**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SARAH CHAMBERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.: 17-cv-5040** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BOARD OF EDUCATION OF THE** | ) | **JURY DEMAND** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Sarah Chambers ("Plaintiff" or "Chambers"), states for her complaint against the

Board of Education of the City of Chicago ("Board"), as follows:

## NATURE OF THE CASE

1.     Plaintiff Sarah Chambers brings this action against the Board, seeking damages

and injunctive relief from the Board's termination of Chambers because of:

   a. Her First Amendment-protected speech in support of special education;

   b. Her disclosing information to parents, the public, in monthly meetings of the
      Board, and to other Board representatives about how the Board was violating
      state and federal laws, rules, and regulations governing special education,
      disclosure which is protected from retaliation under Section 15 of the Illinois
      Whistleblower Act, 740 ILCS 174/15(a);

   c. Her disclosing public wrongdoing, specifically that the Board was violating
      state and federal laws, rules, and regulations governing special education,
      disclosure which is protected from retaliation under Section 20.1 of the
      Illinois Whistleblower Act, 740 ILCS 174/20.1; and

   d. Her disclosing public wrongdoing, specifically that the Board's
      representatives were violating state and federal laws, rules, and regulations

1

governing special education, which is protected from retaliation under the Illinois common law tort of wrongful discharge.

2. Chambers was a special education teacher for the Board since May 19, 2009. During that time, Chambers has been a vocal advocate for special education students. As detailed below, she has complained at numerous Board meetings and to Board administrators about lack of services for special education services, including pointing out how the level of services that the Board provides is below the minimum legal threshold. She has also organized parents and students in support of special education services. Because of her advocacy and because she was disclosing its wrongdoing, the Board decided to terminate Chambers.

**THE PARTIES**

3. The Board is a body politic and corporate by the name "Board of Education of the City of Chicago," located in the Northern District of Illinois, and is a school district maintaining a system of free schools called Chicago Public Schools ("CPS") pursuant to the Illinois School Code, 105 ILCS 5/34-2, *et seq.*

4. One of the Board's schools is Maria Saucedo Scholastic Academy ("Saucedo"). Saucedo serves students from pre-Kindergarten through eighth grade.

5. Since during or around January 2017, the principal at Saucedo has been Virginia Hiltz.

6. From the fall of 2016 through April or May of 2017, the assistant principal at Saucedo was Nancy Quintana.

7. Chambers was an employee of the Board in the position of special education teacher from May 19, 2009 to May 5, 2017. At all times during her work for the Board, she worked at Saucedo. At all times during her work for the Board, Chambers was a resident of the Northern District of Illinois.

2

## JURISDICTION AND VENUE

8. Jurisdiction over Count I arises pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, namely the First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983.

9. Jurisdiction over Counts II through IV is proper pursuant to 28 U.S.C. §1367.

10. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391(b), in that Chambers performed her employment duties exclusively within this judicial district, the claim arose in this judicial district, and most of the relevant witnesses are located in this judicial district.

## FACTUAL ALLEGATIONS

### Chambers's Years of Advocacy for Special Education Students

11. Chambers has been a vigorous advocate for CPS students for years.

12. In September 2015, at a town hall meeting held by Chicago Mayor Rahm Emmanuel, Chambers presented Mayor Emmanuel with a mock "warrant" for his arrest due to his responsibility for slashing funding for special education.

13. Later in September 2015, Chambers spoke during the public comments portion of a Board meeting and raised to the Board the situation of student she knew had been threatened with expulsion for seeking to speak to the Board.

14. In October 2015, Chambers put her concerns into an Op Ed which was published in the Chicago Monitor.

15. In November 2016, Chambers again spoke during the public comments portion of a Board meeting and raised to the Board that severely disabled special education students were not receiving services that they needed due to budget cuts.

16. In December 2016, Chambers and some of her students appeared at a Board meeting and Chambers spoke during the public comments portion of the Board meeting. While she was speaking, Chambers had her wrists bound with red tape to symbolize the complaints she voiced about the inadequate services provided to special education students in CPS.

17. During the 2016-2017 school year, Chambers was co-chair of a coalition in Chicago called the Special Education Task Force ("Task Force"). The Task Force is made up of parents of special education students, teachers and other CPS employees, unions of CPS employees, and disability rights groups.

18. The Task Force created a flyer about special education rights to be distributed to parents of CPS students at the November 9, 2016 report card pick-up day.

19. The Task Force held a number of protests over how the Board was harming special education students in CPS:

   a. On August 26, 2015, the Task Force protested outside of the Board's monthly meeting because the Board was voted on a budget that would to cut tens of millions of dollars from special education funding.

   b. December 7, 2016, the Task Force protested at Chicago City Hall about how the Board's recent changes to how money for special education was distributed to schools.

   c. On December 20, 2016, the Task Force delivered over 100 letters from special education students to the office to Chicago Mayor Rahm Emmanuel describing the impact of special education funding changes as they experienced it.

20. At various points during the 2016-2017 school year, Chambers and the other members of the Task Force held eight meetings throughout Chicago for parents of special

education students, to educate the parents about their rights under special education law. The Board was aware of this because its managers mentioned these meetings when speaking to Chambers.

21.     Chambers is a member of the Chicago Teachers Union ("CTU"), which is a labor organization within the meaning of Section 2(c) of the Illinois Educational Labor Relations Act, 115 ILCS 5/2(c), representing roughly 26,000 professional educators and Board of Education employees. For a number of years, Chambers has been a member of the CTU's Executive Board.

## Targeting of Chambers in Spring 2017

22.     During the spring of 2017, Chambers continued her advocacy for the needs of special education students at Saucedo and elsewhere, but it made her into a target of the Board.

23.     On or about January 26, 2017, Chambers and other teachers met with Hiltz on a number of issues related to Saucedo. One of the subjects that Chambers addressed with Hiltz was the violations of the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA") that were occurring at Saucedo, particularly that students were subject to Individualized Education Plans ("IEPs"), but were not receiving all of the services that those plans mandated. Chambers also addressed that students were being treated as ineligible for special education testing based on lack of information, but lack of information is not supposed to delay testing under IDEA.

24.     On February 7, 2017, Chambers sent Hiltz an email about a violation of a different law that Chambers saw: that Chambers's some of special education class sizes were already at the legal maximum set by Illinois law (see 23 Ill. Admin. Code 226.730(b) & (c)) and Chambers was scheduled to receive another student in a few weeks.

5

25.     On February 8, 2017, Hiltz and other representatives of the Board held a meeting with teachers at Saucedo, including Chambers.  Hiltz handed out new schedules for special education students which reduced the amount of services the students would receive.  The schedule also assigned Chambers by far the busiest schedule of any special education teachers, while leaving other teachers with extra free periods.

26.     It was illegal for Hiltz to reduce the level of services provided to special education students unilaterally and without parent involvement.  Under the IDEA, the amount of services a special education student will receive is set by the student's IEP and an IEP cannot be modified without parental consent. 20 U.S.C.  § 1414.  Chambers sent an email to Hiltz on February 9, 2017, pointing out that reducing services for Saucedo special education students is "illegal to do without all of those parents agreeing to it."

27.     In an email of February 10, 2017, Chambers wrote to Hiltz about another problem: students with limited English skills are supposed to be assigned to special education teachers who have the appropriate certifications for that, but that was not happening.

28.     Saucedo administrators also notified parents of the changes to what services students would receive.  In the course of this, Quintana made untrue and even bizarre accusations against Chambers.

29.     In a telephone call on or about February 10, 2017, Quintana said that the schedule changes and reduction to services to students were because Chambers had sent a letter to CPS's central office saying that teachers were not doing their jobs, but instead were socializing.

30.     Of course, Chambers had not sent any such letter.  Nor does the accusation against Chambers make any sense because there is no reason that a letter from a teacher to CPS's central office would cause CPS to reduce services to special education students.  Nevertheless,

through this bizarre and untrue accusation, Quintana tried to shift the blame onto Chambers for CPS's illegally reducing the services it was providing to special education students.

31. On February 13, 2017, the Saucedo administration held a meeting for parents about the changes to special education services. Representatives of the CTU distributed leaflets outside of the meeting opposing the changes. In the meeting, Quintana told a parent that Chambers was the only teacher objecting to the changes. This was not true because in the days immediately after February 8, 2017, a number of teachers had objected. But again, Quintana was trying to single out Chambers.

32. Indeed, Quintana's bizarre accusations do not even make sense when taken together. It makes no sense to say that everyone but Chambers is satisfied with the changes, while also saying that the changes came about because of a complaint by Chambers. It makes no sense that the person who instigated the changes would be the only person displeased with them. Quintana's objective was to shift blame to Chambers rather than to explain the true situation to parents.

33. Also on February 13, 2017, Chambers attended Board hearings on the CPS budget. Several of Chambers's students accompanied her.

34. On February 15, 2017, Hiltz emailed all teachers at Saucedo to tell them that there would be further changes to services for special education students.

35. Around this time the CTU filed grievances on behalf of Chambers, protesting that the Saucedo administration was breaking special education law and that the Saucedo administration was retaliating against Chambers by assigning her a vastly more burdensome workload than other teachers.

7

36.     In a meeting on February 28, 2017, Chambers complained to Hiltz again about special education students not receiving their "minutes," meaning the amount of time they were supposed to receive services based on their disabilities.

37.     On March 6, 2017, the new schedules for special education services were implemented at Saucedo.

38.     On March 7, 2017, Chambers sent an email to Hiltz complaining that there was a rumor circulating that the second round of proposed changes to special education services had been "to just 'appease Sarah Chambers.'"  It appeared that the administration was again singling out Chambers as a particularly vocal opponent of its illegal cuts to special education.

39.      On March 28, 2017, there was a meeting scheduled about the IEP for a particular special education student at Saucedo. The student's parent was scheduled to attend along with Chambers and a number of Board representatives.  One Board representative was Kim Aguirre. In discussions before the meeting was to begin, Aguirre told Chambers that Aguirre could override an IEP if she did not agree with it.  Chambers believed this to be a violation of the IDEA because an IEP must be made with the agreement of the student's parent.  While Aguirre has the access in the Board's computer system to modify IEPs, it would be against the law for Aguirre to make modifications that a parent did not agree to.  Because Aguirre was saying she would do something unlawful, Chambers asked Aguirre to confirm in writing what she had said. Aguirre refused to do so and cancelled the meeting before the student's parent arrived.  Because Aguirre would not confirm in writing what she said, Chambers sent Aguirre an email on March 28, 2017, to confirm what Aguirre had said.

### Chambers's Performance as a Teacher

40.     Administrators at Saucedo never criticized Chambers's performance as a teacher.

8

41.     For the 2014-15 school year, Chambers was rated "excellent," which is the highest available rating.

42.     For the 2015-16 school year, Chambers was rated "excellent," which is the highest available rating.

**Events of March 2017 PARCC Test**

43.     Students in CPS, including at Saucedo, take a test called the Partnership for Assessment of Readiness for College and Careers ("PARCC").

44.     In the spring of 2017, students at Saucedo were scheduled to take the PARCC test on March 8, 9, and 10, 2017.

45.     On March 8, 2017, Principal Hiltz called Chambers into her office for a meeting.

46.     In the meeting, Hiltz brought up a classroom lesson Chambers had given to students about understanding public debate which had specifically used the merits of the PARCC test as an example of a subject being publicly debated.  Hiltz told Chambers that Chambers "should try to find a more balanced arguments for both sides."  Hiltz described this suggestion to Chambers as "a coaching point."

47.     Chambers told Hiltz that she used the same approach for that lesson involving PARCC as she did for other lessons about controversial topics.  Hiltz said that Chambers should guarantee balance when teaching those other topics, too.

48.     Hiltz did not commemorate her "coaching point" in any written statement to Chambers, nor did Hiltz ever describe the meeting as disciplinary or as being a warning to Chambers.

49.     On March 9, 2017, Quintana and other administrators went into classrooms and told students that the PARCC test was mandatory.  Quintana and other administrations

9

threatened students that if they chose not to take the PARCC test, they would be punished by the school administration and their parents. Quintana also said that the PARCC test is used to determine students' placement in high school for the upcoming school year.

50. On the morning of March 9, 2017, Chambers visited all four of the eighth grade classrooms at Saucedo. In each of the rooms, Chambers told students that they had been given incorrect information because there is a different standardized test called Northwest Evaluation Association ("NWEA") that is used for high school admissions.

51. In fact, Chambers was correct. The PARCC test is not used for any purposes related to high school in CPS. There is another test called NWEA which is used for high school placement.

52. Chambers administered the PARCC test to students as directed by the Board's representatives.

## PARCC Interference Discipline Letters

53. The Board sent disciplinary emails to Chambers and two other teachers at Saucedo accusing them of interfering with the PARCC test. The other two teachers were Marlena Ceballos and Alex Kruger.

54. The Board accused Kruger of allowing a student teacher under her supervision to distribute flyers to students telling them they had a right to refuse the PARCC test.

55. The Board accused Ceballos of interfering with the PARCC test because supposedly her class was the only class of fifth graders where any student declined to take the PARCC test, and also because some of her students completed the test too quickly. The Board removed Ceballos from responsibility for proctoring the PARCC test.

56. The Board did not take action to terminate Ceballos or Kruger, or to discipline them other than as described above.

## Suspension

57. On April 6, 2017, Chambers received an email telling her that she was suspended and banned from all CPS property. Chambers went home and has not returned to Saucedo since.

58. Chambers later received a letter to the same effect.

59. From April 6, 2017 through May 17, 2017, the Board continued to pay Chambers during her suspension.

## Trip to Board Meeting in Support of Chambers

60. Students and others who supported Chambers organized a trip to the Board's regularly scheduled monthly meeting on April 26, 2017.

61. A number of students signed up to participate in the trip. Each student's parent signed a permission slip stating that the student could participate.

62. The students boarded a bus in the parking lot of Saucedo at about 9:00 a.m. in the morning and traveled to the Board's central office at 42 West Madison, Chicago, Illinois for the meeting.

63. The bus returned the students to Saucedo in the early afternoon.

64. Chambers participated in a protest outside the Board meeting at 42 West Madison, Chicago, Illinois, but did not travel with students on the bus or attend the meeting.

65. By terminating Chambers for allegedly encouraging speech on her behalf at a public Board meeting on April 26, 2017, the Board is expressly pointing to First Amendment protected activities by Chambers as its reason to terminate her.

11

**Dismissal Charges**

66.     By letter of May 5, 2017, the Board served Chambers with dismissal charges ("Charges").  A copy of the charges are attached as Exhibit A.

67.     The Charges are replete with unfair and inaccurate characterizations.  Also, the Charges do not show anything that would justify terminating Chambers.  But further, a number of the factual statements are simply false:

    a.  In the March 8, 2017, meeting between Hiltz and Chambers, Hiltz did not warn Chambers about anything nor did anyone say that Chambers's presentation was biased.

    b.  On or about March 9, 2017, Chambers did not tell students "You do not have to take the PARCC test.  They lied to you."  Rather, all that Chambers told students was that they had been given misinformation, specifically that PARCC is not used for high school acceptance and promotion, but rather that another test called NWEA was for those purposes.

    c.  Chambers did not "scheme" to bring students to the April 26, 2017, Board meeting.  This trip was arranged by individuals other than Chambers.

68.     Further, while Chambers did not "scheme" to bring students to the April 26, 2017, Board meeting, the allegation against her is all the more plainly pretextual because Chambers had, in fact, attended Board meetings with her students on several occasions before March 2017.  On those earlier occasions, no one had complained that she should not be taking students to Board meetings, during school hours or otherwise.  Like all monthly meetings of the Board for the last few years, the monthly meetings mentioned above were videotaped and the Board makes the video recording publicly available on the Board's website.

69.     As a direct and proximate result of the Board's dismissal of Chambers, Chambers suffered damages, including but not limited to, lost wages, lost benefits, loss of future

employment commensurate with her experience and professional standing, loss of status and self-esteem. incidental damages, great expense, and pain and suffering in the form of emotional distress, anxiety, embarrassment, and humiliation.

## COUNT I
## BY PLAINTFF SARAH CHAMBERS
## (RETALIATION FOR FIRST AMENDMENT PROTECTED ACTIVTIY)

70.     Plaintiffs incorporate paragraphs 1 through ___ herein by reference.

71.     By the acts described above, and in violation of 42 U.S.C. § 1983, the Board has unlawfully deprived Chambers of her rights under the First Amendment of the Constitution and terminated her specifically for speech of a public nature and interest to the public and under the protection of the First Amendment.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order: (1) awarding Plaintiff reinstatement to a teaching position in Chicago Public Schools with the same seniority status that she would have had, but for her termination; (2) awarding Plaintiff damages equal to her loss of salary and benefits, with interest; (3) awarding Plaintiff costs and reasonable attorney's fees; and (4) awarding such further relief as this Court deems just.

## COUNT II
## BY PLAINTFF SARAH CHAMBERS
## VIOLATION OF SECTION 15 OF
## THE ILLINOIS WHISTLEBLOWER ACT, 740 ILCS 174/15
## (TERMINATING PLAINTIFF FOR DISCLOSING A VIOLATION OF LAW)

72.     Plaintiffs incorporate paragraphs 1 through ___ herein by reference.

73.     The Board discharged Chambers in order to retaliate against Chambers for her activities of disclosing violations of a State or federal law, rule, or regulation, as described above, in violation of Section 15 of the Illinois Whistleblower Act, 740 ILCS 174/15.

13

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order: (1) awarding Plaintiff reinstatement to a teaching position in Chicago Public Schools with the same seniority status that she would have had, but for her termination; (2) awarding Plaintiff damages equal to her loss of salary and benefits, with interest; (3) awarding Plaintiff costs and reasonable attorney's fees; and (4) awarding such further relief as this Court deems just.

**COUNT III**
**BY PLAINTFF SARAH CHAMBERS**
**VIOLATION OF SECTION 20.1 OF**
**THE ILLINOIS WHISTLEBLOWER ACT, 740 ILCS 174/20.1**
**(TERMINATING PLAINTIFF FOR DISCLOSING PUBLIC WRONGDOING)**

74.     Plaintiffs incorporate paragraphs 1 through ___ herein by reference.

75.     The Board discharged Chambers in order to retaliate against Chambers for her activities of disclosing public wrongdoing, as described above, in violation of Section 20.1 of the Illinois Whistleblower Act, 740 ILCS 174/20.1.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order: (1) awarding Plaintiff reinstatement to a teaching position in Chicago Public Schools with the same seniority status that she would have had, but for her termination; (2) awarding Plaintiff damages equal to her loss of salary and benefits, with interest; (3) awarding Plaintiff costs and reasonable attorney's fees; and (4) awarding such further relief as this Court deems just.

## COUNT IV
## BY PLAINTFF SARAH CHAMBERS
## COMMON LAW TORT OF RETALIATORY DISCHARGE
## (TERMINATING PLAINTIFF IN VIOLATION OF
## CLEAR MANDATE OF PUBLIC POLICY)

76.     Plaintiffs incorporate paragraphs 1 through ___ herein by reference.

77.     The Board discharged Chambers in order to retaliate against Chambers for her activities of disclosing violations of special education laws, and that discharges was thus in violation of a clear mandate of public policy in the compliance with special education laws, as described above.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order: (1) awarding Plaintiff reinstatement to a teaching position in Chicago Public Schools with the same seniority status that she would have had, but for her termination; (2) awarding Plaintiff damages equal to her loss of salary and benefits, with interest; (3) awarding Plaintiff costs and reasonable attorney's fees; and (4) awarding such further relief as this Court deems just.

Robert E. Bloch (#6187400)                                          Respectfully Submitted,
Josiah A. Groff (#6289628)
DOWD, BLOCH, BENNETT, CERVONE,                        /s/ Robert E. Bloch
AUERBACH & YOKICH                                              Robert E. Bloch
8 S. Michigan Avenue – 19th Floor                       One of Plaintiff's Attorneys
Chicago, IL 60603
(312) 372-1361

July 7, 2017